IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2018 Term

No. 17-0125

**FILED**
**February 28, 2018**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

GLORIA COWGER,
Petitioner

v.

DENNIS COWGER,
Respondent

Appeal from the Circuit Court of Webster County
The Honorable Richard A. Facemire, Judge
Civil Action No. 15-D-24

REVERSED AND REMANDED
WITH DIRECTIONS

Submitted: January 16, 2018
Filed: February 28, 2018

Dominque Razzook, Esq.
Legal Aid of West Virginia
Charleston, West Virginia
Attorney for the Petitioner

Jared S. Frame, Esq.
Sutton, West Virginia
Attorney for the Respondent

JUSTICE WORKMAN delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.    "In reviewing a final order entered by a circuit court judge upon a review of, or upon a refusal to review, a final order of a family court judge, we review the findings of fact made by the family court judge under the clearly erroneous standard, and the application of law to the facts under an abuse of discretion standard. We review questions of law *de novo*."  Syllabus, *Carr v. Hancock*, 216 W. Va. 474, 607 S.E.2d 803 (2004).

2.    "'A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.  However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.'  Syl. Pt. 1, in part, *In re Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996)."  Syl. Pt. 3, *Estate of Bossio v. Bossio*, 237 W. Va. 130, 785 S.E.2d 836 (2016).

3.    "Under the clearly erroneous standard, if the findings of fact and the inferences drawn by a family [court judge] are supported by substantial evidence, such findings and inferences may not be overturned even if a circuit court may be inclined to make different findings or draw contrary inferences."  Syl. Pt. 3, *Stephen L.H. v. Sherry L.H.*, 195 W. Va. 384, 465 S.E.2d 841 (1995).

i

4.	"Questions relating to alimony and to the maintenance and custody of the children are within the sound discretion of the court and its action with respect to such matters will not be disturbed on appeal unless it clearly appears that such discretion has been abused." Syllabus, *Nichols v. Nichols*, 160 W. Va. 514, 236 S.E.2d 36 (1977).

Workman, Chief Justice:

This is the appeal of Petitioner Gloria Cowger ("the Wife") from the January 10, 2017, order of the Circuit Court of Webster County, West Virginia, reducing the amount of permanent alimony to be paid to her by Respondent Dennis Cowger ("the Husband"). The family court, after hearing the evidence, ordered the Husband to pay permanent alimony to the Wife in the amount of $1,500 per month. But the circuit court, upon the Husband's appeal, reversed the permanent alimony award and remanded the case to the family court for calculation of spousal support "in accordance with" its order. On remand, the family court recalculated the permanent alimony award, ordering the Husband to pay the Wife $439.02 per month. The Wife appealed the reduced permanent alimony award to the circuit court, which refused the petition by order entered January 10, 2017. The Wife contends that 1)"[t]he Circuit Court erred when it forced the Family Court to find that Husband's business earned zero cash income, when Husband admitted a substantial portion of his business' income was received in cash[;]" and 2)"[t]he Circuit Court erred in holding that the Husband's testimony about his unrecorded labor costs must be accepted despite the Family Court's multiple findings of the Husband's fraudulent representations and lack of credibility." Based upon a review of the parties' briefs and arguments, the appendix record, and all other matters submitted before the Court, we reverse the circuit court and remand the

case for reinstatement of the family court's December 16, 2015, order setting the permanent alimony award to be paid by the Husband to the Wife at $1,500 per month.

## I. Factual and Procedural History

The permanent alimony award was the only issue litigated before the family court.[1] The parties were married for almost thirty-four years.[2] They separated on April 18, 2015, and were granted a divorce by the family court, based upon irreconcilable differences. The Wife has a GED and only worked outside the home for a period of about four years during the course of the marriage. Her jobs were part-time, minimum wage and sporadic. The Wife had been out of the workforce for eleven years at the time of the divorce. She testified that she had been a stay-at-home mom when their children were minors. Since that time she continued her work around the home, which included mowing the lawn, stacking hay, paying the bills, doing laundry and taking care of her horses. The Wife's only income at the time of the final divorce hearing was the $500 a month she was receiving in temporary alimony as she had been unable to find employment despite her efforts. Nevertheless, the family court found that the Wife "has the ability to earn a minimum wage income of $1,386.67 gross per month (or about $1,178.67 net per month), which minimum wage

---

[1]The parties reached agreement regarding equitable distribution and attorney's fees, so those were not issues before the courts below.

[2]At the time of the divorce, the Wife was fifty-six years old and the Husband was fifty-eight years old. There were no minor children at the time of the divorce.

2

income should be imputed to her in the determination of her need for alimony from" the Husband.  The family court also found the Wife's monthly expenses to be $2,531.56.  Thus, the family court found that the Wife still had a need of at least $1,352.89.[3]

The Husband has worked as a school bus driver for the Webster County Board of Education ("Board")  for over thirty-two years, a job he performs ten months of the year.  In 2015, the Husband earned $32,532.50 (gross)from his job with the Board, which, after deductions, netted a monthly income of $1,592.35 or total yearly net of $19,108.18.[4]  The family court found the Husband's monthly expenses to be $2,670.  The Husband also has operated his business D.C. Services, which does all types of construction services, for the past twenty-eight years.

The primary focus of the evidence introduced before the family court was directed at D.C. Services and how much income the Husband actually realized from his business.  The Husband did not keep records regarding either his costs expended or income generated with his business.

---

[3]The Husband did not object to these findings regarding the Wife's finances.

[4]The Wife testified that the income from the Husband's Board employment was deposited directly into their joint checking account and all their bills were paid with this income.

3

The Wife testified that she previously helped with the business, "[a]nd then he just refused to let me help." She did not assist at all with the finances of the business. The Wife testified that the Husband's business income was paid by both cash and check and was deposited into a checking account established for the business only. The Husband had sole access to the account, as the Wife was not named or a signatory on the account.[5] The Wife testified that she received an allowance from the Husband of $300 per week in cash, which was corroborated by the Husband's testimony that in 2015[6] he was giving the Wife "roughly three hundred a week."[7] This allowance did not come from their joint checking account, according to the Wife.

The Wife also provided an expert witness, C. Page Hamrick, who testified about the Husband's business. Mr. Hamrick essentially took the monthly deposits into the account for D.C. Services in calendar years 2011, 2012, 2013 and 2014, and multiplied those yearly deposits by fifty percent to arrive at the yearly income (after business deductions) from D.C. Services. According to Mr. Hamrick, the fifty percent total was "a very typical . . .

---

[5]There was another account for the guttering services the Husband provided through his business. According to the Wife, she did have access to this account. There was no other specific evidence about this account offered at the hearing in family court.

[6]The parties last lived together on or about April 18, 2015.

[7]The Wife stated that she had been receiving $500 per week from the Husband, but that the amount had reduced. There was no specific time given by the Wife as to when the reduction had occurred.

4

percentage for a small business like this."  But the family court found much of the Wife's expert's report and testimony not credible because the expert failed to interview the Husband, who was the only person who operated and kept records for D.C. Services, failed to review actual deposits and withdrawals from the D.C. Services bank account and failed to support using a fifty percent formula to calculate what the Husband's net income was in the years examined.   The family court, however, did find reliable the expert's recognition that the income for D.C. Services was underestimated because the Husband never reported his expenses and labor costs, that the records for the Husband's business were sparse and the numbers were "utterly inaccurate[,]"  and that the parties had inaccurately reported income from the business to both the state and federal governments.

After hearing the expert's testimony and recognizing the quagmire that existed regarding the Husband's business income due to the woefully incomplete and inaccurate records, the family court directed the Husband to submit the bank statements from his business, showing all deposits and withdrawals for the business account for 2013.[8]  That year was not in dispute by the parties, as the family court found it to be "the last year . . . [the Wife] signed the joint tax returns filed by the parties . . . ."[9]  According to the family court,

_____

[8]There was no objection raised by the Husband regarding either the production of the bank records of the business for 2013 requested by the family court or the review of those records by the family court.

[9]The Wife testified that she refused to sign the joint tax return for 2014 as she had
(continued...)

5

it simply could not "be determined with any certainty as to whether . . . [the Husband] deposited all of his gross receipts, both checks and cash, into the D.C. Services account." Nonetheless, the family court "believe[d] the detailed review of the 2013 records (as well as the detailed review of the 2015 records through April, 2015) produce[d] a clearer (though still clouded) picture of . . . [the Husband's] income from D.C. Services."

The Husband testified that he had reviewed the bank statements and "believe[d] that the 2013 bank account statements are an accurate reflection of the business that D[.]C[.] Services did in 2013[.]" The Husband testified that he paid his employees in cash. According to the Husband, he had four employees in 2013, three of whom earned $12 an hour and one who earned $10 an hour; however, there were no records regarding how many hours these individuals worked or how much money they were paid for the work they did. Further, in 2013, the Husband submitted a letter to the Contractor's Licensing Board in which he claimed that he only had part-time employees and that two individuals, who during hearing the Husband testified to being his employees, "'occasionally volunteer to help Dennis Cowger as they are all good friends.'" The Husband confirmed that the letter was his company's means of informing the agency that two of his employees were not paid in 2013 and that he did this to protect his employees. Further, the Husband testified that he did

_____

[9](...continued)
received the report from Mr. Hamrick and she "did not know there was that much money going through that account." The Wife testified that she had found documents, invoices from previous years, which indicated discrepancies in what had been reported on tax returns.

6

not identify any contract labor expenses or expenses for supplies for his business in his taxes for 2013. The Husband also testified that there were no 1099's or W-4's that were prepared by or for his employees. The Husband also did not file a Wage Bond Affidavit Status about his employees with the Department of Labor. But the Husband also testified that he paid his employees in cash and that his labor costs were $25,087 in 2013, or about 46.45 percent of his net income.[10] During cross-examination when the Husband was questioned, "But . . . now that[] it[']s more in your favor you want to change your mind and say that you do have employees and you have had them since 2012[,]" he responded, "Correct."

Additionally, the Husband testified that he kept, on the average, about $400 a week in cash from his business for himself. Even though the Husband maintained that he was earning less in 2015, only taking home about $300 a week from the business, the family court found this unsupported testimony not credible.[11] Despite the Husband's testimony, he

---

[10]The Wife argued that the Husband could not claim more than $6,000 from this income as labor costs, because under State law if an employer pays wages in excess of that amount per quarter, then certain documents must be filed. Thus, the Wife only attributed about 11.1 percent of the net taxable income available to labor costs. Just as the family court discounted the labor costs the Husband claimed from the business, the family court discredited the low percentage of labor costs offered by the Wife "[b]ecause . . . [the Wife] admitted her knowledge that . . . [the Husband] was paying his employees in cash 'under the table,' this Court seriously doubts that . . . [the Husband's] labor costs were as low" as the percentage argued by the Wife.

[11]The family court's credibility determination on this issue stemmed from the deposits made into the D.C. Services bank account for the first four months of 2015, which totaled $50,606.29. As the family court found, "factored over the course of the year [this amount] (continued...)

7

indicated on his financial statement submitted as part of the divorce action that his self-employment income each month was $0. The Husband also stated about the income he received and the costs he paid that he had "no documents" to show what kind of income he made from his business.

The family court also undertook its own examination of the D.C. Services bank records for 2013 that the Husband was ordered to submit to the court and found that $132,243.56 was deposited into the business account that year, which amount was not disputed by the Husband. The family court further found that from this total, checks totaling $126,637.80 were written on this account and from that amount, checks totaling $46,159 were written by the Husband to himself. Other checks totaling $68,249.90 were written to businesses such as Lowe's, Casey's Hometown Hardware and Nicholas County Solid Waste Authority. There were also checks totaling $9,986.54, which were written to entities like gas stations and insurance companies. The family court found that the amounts of $68,249.90 and $9,986.54, respectively, should be deducted as business expenses, which left a total of $54,007.12. This total, however, did not reflect any labor costs.

---

[11](...continued)
would average $151,818.87, which is well in excess of the 2013 deposits of $132,243.56[]." Further, the family court noted that from the 2015 deposits, the Husband had written checks to himself totaling $16,206.01, which when averaged for the year would be $48,618.63, which sum also exceeded the amount he wrote to himself from the business account in 2013.

Because the family court did not find credible either the Wife's or the Husband's calculations and because there was simply no way to calculate actual labor costs due to the lack of records, the Court found "it fair to average the differing labor cost percentages (from the percentage offered by the Wife and the percentage offered by the Husband), resulting in a fair labor percentage of 28.775 percent."  As the family court reasoned:

> Applying that percentage to the net taxable income of $54,0071.21 leaves a labor cost of $15,540.57, which would reduce the net taxable income in 2013 from D.C. Services to $38,466.64 (or a gross per month of $3,205.55, or an approximate net monthly income of $2,404.16).  The net taxable income of $38,466.64 realized in 2013 under this analysis is 29.09 percent of the total 2013 receipts.

The family court, multiplying the 29.09 percent figure to the gross receipts in 2011, 2012, 2014, as well as the available receipts from 2015, determined that the average income for D.C. Services for the years 2011 through 2015 was $37,774.38, "which average amount is very close to the $38,466.64 amount realized in 2013 under the very detailed analysis" of that year undertaken by the family court.  The family court therefore found that the Husband has and will have "in the future the ability to earn $37,774.38 per year from D.C. Services (or a gross per month of $3,147.86, which is an approximate net monthly income of $2,360.90)."

The family court then determined the Husband's total net income earning ability was "at least, approximately, $3,953.25 per month (i.e., bus driving net income of

9

$1,592.35 and D.C. Services income of $2,360.90).” Further, the family court determined that the Husband had “excess income above his expenses of $1,283.25 per month (i.e., $3,953.25 income less expenses of $2,670.00 equals $1,283.25 per month).” Thus, the family court concluded that the Husband had the ability to pay $1,283.25 per month in alimony. Moreover, the family court found that it was “highly probable that . . . [the Husband] has not accounted for any cash income not deposited into the D.C. Services account.” The family court determined that Wife “should not be denied additional alimony merely because those amounts are hidden.” The family court then attributed an additional sum of $216.75 per month to the award for cash-based income, because the documentation before it “suggest[ed] a higher income amount tha[n] this Court's average income analysis[.]” The total permanent alimony award ordered by the family court was $1,500 per month.[12]

On appeal to the circuit court, the Husband argued that 1) the amount of spousal support he was ordered to pay was disproportionate to his ability to pay; 2) the family court improperly calculated Husband's income from D.C. Services; and 3) the family court erred in awarding permanent alimony. The circuit court upheld the family court's decision

---

[12]The family court's award of alimony to Wife was based upon its assessment of the statutory factors, which included the Wife's need for alimony, the Husband's ability to pay, the length of the marriage, the ages of the parties, the Husband's ability to produce substantial income and the Wife's ability to earn only minimum wage income. *See* W. Va. Code § 48-6-301 (2015). There is no error raised regarding the lower court's application of these factors.

to award permanent alimony, but found that alimony in the amount of $1,500 per month was in error. The circuit court determined that the "Family Court ignored the evidence, or lack of evidence, presented below that clearly showed that the . . . [Husband] was earning far less from the marital business" and that the Husband "consistently stated and testified that he averaged around $300 to $400 per week income from D[.]C[.] Services." The circuit court found that "[t]he parties' alleged misrepresentation of the nature of the business has no bearing on what . . . [the Husband] earned on a monthly basis." The circuit court further upheld the Husband's testimony on what his expenses were and found the family court's "other number . . . for labor is speculation, and not based on testimony or evidence." The circuit court found that there was no evidence of cash-based income supporting the $216.75 portion of the alimony award. The circuit court remanded the case for calculation of spousal support "in accordance with" its order.

Upon remand, the family court expressly found that its hands were tied by the circuit court's dismissal of its credibility determination regarding the Husband's business. The family court found that the circuit court "effectively forced this Court to accept only . . . [the Husband's] testimony about the income he received from D[.]C[.] Services." The family court then recalculated the spousal support award by taking an average of the $300 to $400 per week that Husband testified he realized from his business. The family court

11

determined that the Husband had a monthly excess net of $439.02 and that that amount

should be paid to the Wife as support. According to the family court

> [a]warding such $439.02 amount would be a total travesty of
> justice under the factual findings previously made by this Court.
> [The Husband] . . . paid $500.00 per month under this Court's
> temporary Order and made no valid argument that he could not
> make those temporary payments. Further, this Court should not
> be forced to accept a party's testimony that this Court finds
> without merit and unsupported by any records. . . . Except for
> having to comply with a Circuit Court remand Order which
> places this Court in a position to believe testimony this Court
> finds not believable, this Court would find on further review that
> no change [in the $1500 per month award previously made] is
> proper.

On the Wife's appeal to the circuit court, the circuit court simply refused the

appeal by order entered January 10, 2017. The instant appeal followed.

## II. Standard of Review

We have previously held that

> [i]n reviewing a final order entered by a circuit court
> judge upon a review of, or upon a refusal to review, a final order
> of a family court judge, we review the findings of fact made by
> the family court judge under the clearly erroneous standard, and
> the application of law to the facts under an abuse of discretion
> standard. We review questions of law *de novo*.

Syllabus, *Carr v. Hancock*, 216 W. Va. 474, 607 S.E.2d 803 (2004); *see also* Syl. Pt. 1,

*Paugh v. Linger*, 228 W. Va. 194, 718 S.E.2d 793 (2011).  Keeping this standard of review

in mind, we now examine the issues before us.

### III.  Discussion

The focus of both of the Wife's assigned errors is that the circuit court

supplanted its opinion for that of the family court concerning critical factual and credibility

determinations.[13]  The Wife first argues that the circuit court improperly overturned the

family court's finding that $216.75 should be attributed to the Husband for cash-based

income from his business, D.C. Services.  Instead, the circuit court found:

> 9.       The Family Court . . . attributed to the . . . [Husband] an
> additional $216.75 per month in cash income from
> D[.]C[.] Services, even though no evidence of cash
> income or the amount of cash income per month was
> presented.

[13]The Wife also suggests that the circuit court erred in failing to issue its two orders within the statutory sixty-day period.  *See* W. Va. Code § 51-2A-14(f) ("The circuit court must enter an order ruling on a petition for appeal [from a family court's order] within sixty days from the last day a reply to the petition for appeal could have been filed.  If the circuit court does not enter the order within the sixty-day period or does not, within the sixty-day period, enter an order stating just cause why the order has not been timely entered, the circuit clerk shall send a written notice to the parties that unless the parties both file an objection within fourteen days of the date of the notice, the appeal will be transferred to the Supreme Court of Appeals as provided in section fifteen [§ 51-2A-15] of this article due to the failure of the circuit court to timely enter an order. The appeal shall be transferred without the necessity of the filing of any petition or further document by the petitioner.").  But the Wife fails to raise any assignment of error regarding this issue and develop properly the matter for this Court's consideration, choosing rather to only mention the failure in passing in her brief. We therefore decline to address the issue.

10. The Family Court seems to have attributed the extra $216l75[sic] per month based solely on the fact that the . . . [Husband] allegedly did not properly report all of D[.]C[.] Service's income to the appropriate agencies.

11. The inclusion of the additional "cash income" appears to have been speculation on the part of the Family Court.

The Wife argues that contrary to the circuit court's finding that there was "no evidence of cash income," the Husband acknowledged that "a lot" of the income received by his business was in cash; however, the amount was not documented.

The Wife also argues that the circuit court erred in finding that "[t]he only testimony" offered regarding the labor costs of the Husband's business was his testimony that his employees were paid "approximately $25,087.00 in 2013." Thus, the circuit court determined that "[a]s no other evidence of wages was offered by . . . [the Wife], the Family Court should have considered the . . . [Husband's] testimony, regarding the wages paid in 2013, in placing a value on the . . . [Husband's] monthly income from D[.]C[.] Services." The circuit court further found:

> As the only direct testimony of what the labor chargers were is the testimony of the . . . [Husband], any other number used by the Family Court for labor is speculation, and not based on testimony or evidence, and therefore, the Court finds the Family Court erred in calculating the monthly income from D[.]C[.] Services.

The Wife contends that the circuit court's determination that the Husband's undocumented labor costs must be accepted as true, despite the family court's determinations about

14

Husband's fraudulent representations and lack of credibility, was in error. The Wife emphasizes that the "unknown component" of the Husband's business was his labor costs.

The issues in this case are resolved by application of the standard of review that governs a circuit court's review of a family court's decision in a divorce case. Similar to the standard of review utilized by this Court that is set forth in *Carr*, West Virginia Code § 51-2A-14(c) (2016) provides that "[t]he circuit court shall review the findings of fact made by the family court judge under the clearly erroneous standard and shall review the application of law to the facts under an abuse of discretion standard."

In syllabus point three of *Estate of Bossio v. Bossio*, 237 W. Va. 130, 785 S.E.2d 836 (2016), we explained what is meant by clearly erroneous finding as follows:

> "A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, in part, *In re Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).

Stated another way, we have explained that "[u]nder the clearly erroneous standard, if the findings of fact and the inferences drawn by a family [court judge] are supported by substantial evidence, such findings and inferences may not be overturned even if a circuit

15

court may be inclined to make different findings or draw contrary inferences." Syl. Pt. 3, *Stephen L.H. v. Sherry L.H.*, 195 W. Va. 384, 465 S.E.2d 841 (1995); *accord* Syl. Pt. 2, *Warren v. Garland*, 235 W. Va. 115, 772 S.E.2d 214 (2015).

Finally, we have previously held that "[q]uestions relating to alimony and to the maintenance and custody of the children are within the sound discretion of the court and its action with respect to such matters will not be disturbed on appeal unless it clearly appears that such discretion has been abused." Syllabus, *Nichols v. Nichols*, 160 W.Va. 514, 236 S.E.2d 36 (1977); *accord* Syl. Pt. 2, *Mayle v. Mayle*, 229 W. Va. 179, 727 S.E.2d 855 (2012). Further, like the circuit court, this Court "must give appropriate deference to the family court's determination of the amount, nature and duration of the spousal support." *Id*. at 185, 727 S.E.2d at 861.

In the instant matter, regarding the award by the family court of $216.75 for cash-based income, the circuit court simply found that there was "no evidence of cash income or the amount of cash income per month was presented." This finding, however, ignores the Husband's own testimony that indicated his business had cash income, he just failed to keep any records of how much cash income he had. The circuit court also disregarded the family court's specific findings made concerning the Husband intentionally defrauding both state and federal authorities about his income, as well as hiding cash income

16

from the government and his Wife by not reporting that component of his business. The circuit court failed to set forth how the family court's findings regarding the cash-based income were not supported by substantial evidence, including the family court's credibility determinations. As such, the circuit court's overturning of these findings was in error.

Moreover, review of the circuit court's order on the issue of the Husband's labor costs also reveals that with no real explanation the circuit court found the Husband's testimony credible on this issue, which was also in direct contradiction to the family court's findings. A review of the family court's order shows it methodically examined all the evidence introduced before it, which failed to include any evidence of any labor costs actually paid out by the Husband due to the lack of records that he kept, and made credibility determinations based upon the evidence. In so doing, the family court was clear that the Husband was making more profit from his business than he was disclosing to the family court, as well as governmental agencies, and that he was overinflating his labor costs for purposes of the family court proceeding. The family court also found that the Husband had "intentionally defrauded State authorities," that the Husband had "offered no documentation for" the $25,087 he testified to paying in labor costs, and that the Husband "admitted that he paid his employees in cash to avoid having to pay certain unemployment and workers' compensation costs to the State, and to 'help' his employees who were 'working under the table' for cash." Thus, the family court expressly found that it could not "conclusively

17

conclude that . . . [the Husband's] 46.45 percent labor cost . . . [was] correct. . . ." But the circuit court inexplicably ignored the credibility determinations made by the family court, as well as its reasoning supporting these determinations, and replaced those determinations with its own – something our law prohibits both the circuit court and this Court from doing. *See Mulugeta v. Misailidis*, 239 W. Va. 404, ___, 801 S.E.2d 282, 290 (2017) (determining that this Court will not disturb a family court's credibility finding "because it was within the province of the family court to determine the weight according . . . [the Husband's] testimony."). Consequently, the circuit court's decision directing the family court to take the Husband's testimony regarding the labor costs of his business as true is simply inexplicable and in error.

## IV. Conclusion

Based upon the foregoing opinion, the decision of the circuit court is reversed and the case is remanded for reinstatement of the family court's December 16, 2015, order awarding the Wife permanent alimony in the amount of $1,500 per month.

Reversed and remanded with directions.